**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Lydia S. Nelson,<br><br>    Plaintiff,<br><br>vs.<br><br>Carolyn W. Colvin,[1] Acting Commissioner of the Social Security Administration,<br><br>    Defendant. | No. CV-12-1514-PHX-GMS<br><br>**ORDER** |

Pending before the Court is the appeal of Plaintiff Lydia Nelson, who challenges the Social Security Administration's (SSA) decision to deny benefits. (Doc. 1.) For the reasons set forth below, the Court affirms the decision of the SSA.

## BACKGROUND

Nelson claims that she has been disabled since August 19, 2008. (R. at 23.) Prior to the onset of her alleged disability, Nelson worked as a copier. (*Id*. at 27.) She submitted a Title II application for disability and disability benefits on September 18, 2008. (*Id*. at 21.) The SSA denied her claims on October 2, 2008, and again upon reconsideration on July 20, 2009. (*Id.*) Nelson subsequently requested a hearing, which was held on February 9, 2011, in Phoenix, Arizona. (*Id.*) On February 24, 2011, the Administrative Law Judge (ALJ) issued a decision finding that Nelson was not disabled

---

[1] Carolyn W. Colvin became the Acting Commissioner of the Social Security Administration on February 14, 2013, subsequent to the filing of this suit. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure and 42 U.S.C. § 405(g), Carolyn W. Colvin is substituted for Michael J. Astrue as the Defendant in this suit.

under sections 216(i) and 223(d) of the Social Security Act. (*Id.* at 28.)

To determine whether Nelson was disabled, the ALJ undertook the five-step analysis detailed at 20 C.F.R. §§ 404.1520(a) and 416.920(a).[2] (R. at 22.) He determined at the first step that Nelson had not engaged in substantial gainful activity since August 19, 2008, the alleged onset date. (*Id.* at 23.) The ALJ then found that Nelson had the following severe impairments: bipolar disorder, anxiety, depression, and schizophrenia. (*Id.*) At step three, the ALJ determined that none of these impairments, either alone or in combination, met or equaled any of the SSA's listed impairments. (*Id.* at 23–24.)

At that point, the ALJ made a determination of Nelson's residual functional capacity (RFC),[3] concluding that she could "perform a full range of work at all exertional levels with the following nonexertional limitations: only simple, routine, repetitive tasks

---

[2] Under the test:

> A claimant must be found disabled if she proves: (1) that she is not presently engaged in a substantial gainful activity[,] (2) that her disability is severe, and (3) that her impairment meets or equals one of the specific impairments described in the regulations. If the impairment does not meet or equal one of the specific impairments described in the regulations, the claimant can still establish a prima facie case of disability by proving at step four that in addition to the first two requirements, she is not able to perform any work that she has done in the past. Once the claimant establishes a prima facie case, the burden of proof shifts to the agency at step five to demonstrate that the claimant can perform a significant number of other jobs in the national economy. This step-five determination is made on the basis of four factors: the claimant's residual functional capacity, age, work experience and education.

*Hoopai v. Astrue*, 499 F.3d 1071, 1074–75 (9th Cir. 2007) (internal citations and quotations omitted).

[3] In greater detail, a residual functional capacity ("RFC") is "an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis." SSR 96–8p. In particular, the RFC assessment must describe the maximum amount of each work-related activity the individual can perform based on the evidence available in the case record. *Id.* The RFC determination may be based on a wide variety of evidence in the record–the claimant's medical history, laboratory findings, the effects of treatment, reports of daily activities, lay evidence, recorded observations, medical source statements, effects of symptoms that are reasonably attributable to a medically determinable impairment, evidence from attempts to work, the need for a structured living environment, and work evaluations. *Id*

- 2 -

in a work environment free of fast-pace production requirements and involving only work-related decisions with few, if any workplace changes." (*Id.* at 24–25.) Still at step four, the ALJ concluded that Nelson was capable of performing her past work as a copier. (*Id.* at 27.) The ALJ therefore did not reach step five. The Appeals Council declined to review the decision. (*Id.* at 1–4.)

Nelson filed the Complaint in this action on July 13, 2012, seeking the Court's review of the ALJ's denial of benefits. (Doc. 1.) The matter became fully briefed on May 24, 2013. (Docs. 13, 14, 20.)

**DISCUSSION**

**I.  LEGAL STANDARD**

A reviewing federal court will address only those issues raised by the claimant in the appeal from the ALJ's decision. *See Lewis v. Apfel*, 236 F.3d 503, 517 n.13 (9th Cir. 2001). A federal court may set aside a denial of disability benefits when that denial is either unsupported by substantial evidence or based on legal error. *Thomas v. Barnhart*, 278 F.3d 947, 954 (9th Cir. 2002). Substantial evidence is "more than a scintilla but less than a preponderance." *Id.* (quotation omitted). It "is relevant evidence which, considering the record as a whole, a reasonable person might accept as adequate to support a conclusion." *Id.* (quotation omitted).

The ALJ is responsible for resolving conflicts in testimony, determining credibility, and resolving ambiguities. *See Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995). "When the evidence before the ALJ is subject to more than one rational interpretation, we must defer to the ALJ's conclusion." *Batson v. Comm'r of Soc. Sec. Admin.*, 359 F.3d 1190, 1198 (9th Cir. 2004). This is so because "[t]he [ALJ] and not the reviewing court must resolve conflicts in evidence, and if the evidence can support either outcome, the court may not substitute its judgment for that of the ALJ." *Matney v. Sullivan*, 981 F.2d 1016, 1019 (9th Cir. 1992) (citations omitted).

Harmless errors in the ALJ's decision do not warrant reversal. *Stout v. Comm'r, Soc. Sec. Admin.*, 454 F.3d 1050, 1055–56 (9th Cir. 2006). Errors are harmless if they are

"inconsequential to the ultimate nondisability determination." *Molina v. Astrue*, 674 F.3d 1104, 1115 (9th Cir. 2012). In other words, harmless error occurs when the record shows that "the ALJ would have reached the same result absent the error" or "it was clear [the errors] did not alter the ALJ's decision." *Id.* "[T]he burden of showing that an error is harmful normally falls upon the party attacking the agency's determination." *Shinseki v. Sanders*, 556 U.S. 396, 409 (2009).

## II.   ANALYSIS

Nelson argues that the ALJ erred by: (A) accepting certain medical source opinions that actually supported a claim of disability, (B) rejecting the opinions of Nelson's treating psychiatrist and nurse practitioner that Nelson's symptoms prevented her from working, (C) discounting Nelson's own testimony regarding the severity of her symptoms, and (D) failing to discuss a Third Party Report from Nelson's friend.

### A.   Accepted Medical Source Opinions

The ALJ ultimately found that Nelson had the RFC "to perform a full range of work at all exertional levels but with the following nonexertional limitations: only simple, routine, repetitive tasks in a work environment free of fast-pace production requirements and involving only work-related decisions with few, if any workplace changes." (R. at 25.) The ALJ relied both on the VE's testimony that an individual with Nelson's RFC would be able to perform Nelson's past work as a copier, and apparently on his own judgment that Nelson, given the RFC he assigned, would be able to do her past work as a copier. (*Id.* at 27.)

In his Decision, the ALJ cited as supporting evidence the opinions of three physicians: Drs. Brent Geary, S. Tyutyulkova, and Stephen Fair. (R. at 26–27.) The ALJ claimed that these "[a]ssessments . . . support the conclusion that the claimant's mental impairments are not disabling." (*Id.* at 26.) Nelson argues that the ALJ's RFC and ultimate non-disability determination are not supported by substantial evidence because the reports of each of the three doctors cited by the ALJ individually point to the opposite conclusion, namely, that she is disabled.

### 1. Dr. Geary

Dr. Geary diagnosed Nelson with a presently moderate form of bipolar disorder in December 2008. (*Id.* at 294.) After examining and interviewing Nelson, Dr. Geary made the following observations about Nelson's function capacity: difficulty maintaining focus; weakness in calculation; not limited in her ability to understand and remember information; mild limitations in her capacity to sustain concentration, with difficulties in maintaining sustained attention; moderate limitations in persistence; prone to periods of impulsivity when she gets off track and loses task orientation; not particularly limited in social interaction; moderate limitations in adaptation; experiences mood swings with periods of nonproductivity and unreliability; and experiences lapses in judgment and psychotic symptoms if she is not medicated. (*Id.* at 294–95.) Dr. Geary did not offer any specific opinion on whether those limitations rendered Nelson disabled.

The ALJ recited these observations in his decision as evidence supporting his determination of Nelson's RFC. (*Id.* at 26.) But when Nelson presented the vocational expert who testified at the hearing with a hypothetical person with the limitations identified by Dr. Geary alone, the expert opined that there would be no work for such an individual. (*Id.* at 69–70.) Nelson claims that the ALJ cannot cite the opinion of an examining physician to "support the conclusion that the claimant's mental impairments are not disabling," (*id.* at 26), when those same limitations preclude the availability of work.

Dr. Geary's opinion, however, was not the RFC that the ALJ determined for Nelson. It was only one of several factors that the ALJ considered in arriving at the RFC. As discussed below, other doctors found slightly different limitations, and the ALJ came up with Nelson's RFC based on the collective medical evidence. Thus, the ALJ reasonably synthesized the limitations Dr. Geary observed (limitations in sustaining attention, persistence, and staying on task) along with the limitations observed by the other cited doctors into Nelson's RFC by limiting her to "only simple, routine, repetitive tasks in a work environment free of fast-pace production requirements and involving only

work-related decisions with few, if any workplace changes." (*Id.* at 24–25.) After comparing the ALJ's RFC, Dr. Geary's opinion, and the vocational expert's testimony, it is apparent that the ALJ did not adopt all of the restrictions observed by Dr. Geary. Nor was he required to. He reasonably incorporated Dr. Geary's opinion as part of the overall medical evidence and adjusted the RFC to reflect the general tenor the limitations Dr. Geary observed. And the vocational expert opined that Nelson could return to her previous work, given the RFC the ALJ assigned to her. Nelson would have Dr. Geary's opinion play an outsized role in the RFC determination by highlighting potential conflicts with the ALJ's ultimate RFC. Yet the ALJ's interpretation of Dr. Geary's opinion is a reasonable one, and that ends this Court's review of the ALJ's determination. *See, e.g.*, *Matney*, 981 F.2d at 1019.

The existence of a contrasting interpretation of Dr. Geary's opinion from the vocational expert does not make the ALJ's interpretation unreasonable or lacking substantial evidence. First, the ALJ was not bound by the vocational expert's interpretation of the limitations identified by Dr. Geary. By law, that determination is left to the ALJ alone. *See, e.g.*, 20 C.F.R. § 404.1527(d); *Gomez v. Chater*, 74 F.3d 967, 972 (9th Cir. 1996) ("Thus, while the ALJ called a vocational expert to testify at the hearing, he ultimately and properly relied solely on the medical-vocational guidelines in Part 404, Subpart P, Appendix 2, in finding that Gomez could perform other work in the national economy."). Second, the hypothetical Nelson presented to the vocational expert reflected the opinion of just one doctor. The Ninth Circuit has long held that the testimony of a vocational expert loses its evidentiary value when the hypothetical presented was incomplete. *See, e.g.*, *Delorme v. Sullivan*, 924 F.2d 841, 850 (9th Cir. 1991). If the ALJ cannot rely on the vocational expert's response to an incomplete hypothetical, neither can Nelson. An ALJ is "free to accept or reject restrictions in a hypothetical question that are not supported by substantial evidence." *Osenbrock v. Apfel*, 240 F.3d 1157, 1164–65 (9th Cir. 2001) (holding that the ALJ did not err in asking hypotheticals to the VE that did not reflect all of the claimant's alleged limitations when those omitted limitations were not

supported by substantial evidence). The ALJ could reasonably accept the general contours of the limitations identified by Dr. Geary and yet find those limitations to be less severe. Either way, the ALJ was not bound by the expert's interpretation of Dr. Geary's opinion. The ALJ was permitted to consider Dr. Geary's opinion in conjunction with the other medical evidence to arrive at an RFC for Nelson. Because there is substantial evidence to support the ALJ's interpretation of Dr. Geary's testimony, there was no error. *See Gomez*, 74 F.3d at 972 (noting that *Magallanes* "requires that there be substantial evidence for rejecting the opinion of a vocational expert resulting from a hypothetical question propounded by claimant's counsel"); *Magallanes*, 881 F.2d at 756–57 (observing that "[t]he ALJ is not bound to accept as true the restrictions presented in a hypothetical question propounded by a claimant's counsel. . . . Rather, the ALJ is free to accept or reject these restrictions . . . as long as they are supported by substantial evidence. . . . This is true even where there is conflicting medical evidence" (internal quotation marks and citations omitted)).

Moreover, even if the ALJ was required to explicitly address the contrary expert testimony, any error was harmless. It is clear the ALJ would reach the same decision if this Court were to reverse solely on the basis that the ALJ did not address the contrary vocational expert testimony. *See Molina*, 674 F.3d at 1115 (recognizing harmless error where "the ALJ would have reached the same result absent the error" or "it was clear [the errors] did not alter the ALJ's decision"). As discussed below, Nelson has shown no other error in the ALJ's handling of the medical evidence. Consequently, there was no material error in the ALJ's treatment of Dr. Geary's opinion.

### 2. Drs. Tyutyulkova and Fair

Like Dr. Geary, Dr. Tyutyulkova assessed Nelson in December 2008, though it does not appear Dr. Tyutyulkova examined Nelson. Dr. Tyutyulkova filled out the SSA's standard Mental Residual Function Capacity Assessment ("MRFCA"). This form has several parts, but only Sections I and III are relevant here. Section I asked Dr. Tyutyulkova to check boxes regarding Nelson's limitations, while Part III asked Dr.

Tyutyulkova to provide a narrative evaluation of Nelson's functional capacity. (R. at 314–19.)[4] In the functional capacity assessment, Dr. Tyutyulkova opined that Nelson had no limitation in memory; the ability to engage in day-to-day activities independently; less than substantial limitation in the ability to sustain concentration and pace; the ability to complete a normal workday/workweek with minimal interruption from symptoms; minimal limitation in the ability for appropriate social interactions; no evidence of paranoia; and less than substantial limitation in the ability to adjust appropriately to changes in routine. (*Id.* at 319.)

Dr. Fair followed a similar procedure. (*Id.* at 443–49.) He observed that

> The claimant is earning B's and C's in her EEG training program and is able to understand and remember detailed tasks. She is successfully working on a training program and attending rehab program 3 days a week. So, she would be able to persevere and concentrate on at least simple, routine work over an extended period of time. She is able to interact appropriately with her case manager and TNP and would be able to interact with others in a work situation. The claimant has been able to adjust to a class schedule while also attending a rehab program. So, she is able to adapt to changes in a simple work environment.

(*Id.* at 449.) Like he did with Dr. Geary, the ALJ repeated and relied on the conclusions of Drs. Tyutyulkova and Fair in his decision. (*Id.* at 26–27.)

The opinions of Drs. Tyutyulkova and Fair as to Nelson's functional capacity are not inconsistent with the ALJ's RFC and ultimate disability determination. The opinions reflect symptoms that are not so severe as to prevent Nelson from employment.

Nelson, however, did not present the doctors' functional capacity assessments to the vocational expert; instead, Nelson offered the checkbox notations the doctors had made in Section I of the MRFCA. (*Id.* at 314–15, 447–48, 67–69.) There, Drs. Tyutyulkova and Fair checked the box "moderate limitation" for several activities. (*Id.* at 314–15, 447–48.) The ALJ did not, however, rely on these notations for his conclusion— he relied on the written opinion of the physicians that appeared at the end of their report.

---

[4] That Dr. Tyutyulkova wrote her functional capacity assessment in a separate document and not in the provided form does not alter this analysis.

- 8 -

Indeed, there is good reason for the ALJ to place greater weight on the final conclusions in Part III over the checkboxes in Part I. SSA's Program Operations Manual System ("POMS"), § DI 24510.060, https://secure.ssa.gov/poms.nsf/lnx/424510060, describes how the MRFCA form functions. POMS designates Section I as "merely a worksheet to aid in deciding the presence and degree of functional limitations and the adequacy of documentation" and notes that it "does not constitute the RFC assessment." *Id.* In contrast, Section III "is for recording the mental RFC determination. It is in this section that the actual mental RFC assessment is recorded, explaining the conclusions indicated in section I, in terms of the extent to which these mental capacities or functions could or could not be performed in work settings." *Id.* Section III, in other words, is not direct evidence of the existence of disability. While the POMS does not carry the force of law, it has persuasive authority and sheds light on how the SSA intends the MRFCA to function. *See Wash. State Dep't of Soc. & Health Servs. v. Guardianship Estate of Keffeler*, 537 U.S. 371, 385 (2003) (stating that POMS "warrant[s] respect"); *Warre v. Comm'r of Soc. Sec. Admin.*, 439 F.3d 1001, 1005 (9th Cir. 2006) (stating that POMS "is persuasive authority").

The ALJ did not err by relying on the conclusions of Drs. Tyutyulkova and Fair in Section III over the checkbox notations in Section I. *See Molina*, 674 F.3d at 1111 (stating that the ALJ may "reject[ ] . . . check-off reports that [do] not contain any explanation of the bases of their conclusions"). The conclusions in Section III represent the most accurate picture of the physicians' opinions and those entitled to the greatest weight.

### B. The Treating Physician and Nurse Practitioner

Nelson claimed that the ALJ improperly discounted the opinions of her treating psychiatrist and nurse practitioner on the effect of her symptoms. The regulations impose a hierarchy for medical opinions offered by licensed doctors. The opinion of a treating physician is given more weight than non-treating and non-examining medical sources. *See Orn v. Astrue*, 495 F.3d 625, 631 (9th Cir. 2007); *Lester v. Chater*, 81 F.3d 821, 830

(9th Cir. 1995); 20 C.F.R. § 404.1527. When the treating doctor's opinion is uncontradicted, the ALJ can reject those conclusions only for "'clear and convincing' reasons." *Lester*, 81 F.3d at 830 (quoting *Baxter v. Sullivan*, 923 F.2d 1391, 1396 (9th Cir. 1991)). Even when another doctor disagrees with the treating doctor's opinion, as is the case here with Drs. Tyutyulkova and Fair, the ALJ can reject the treating doctor's conclusions only when he provides "'specific and legitimate reasons' supported by substantial evidence in the record for so doing." *Id.* (quoting *Murray v. Heckler*, 722 F.2d 499, 502 (9th Cir. 1983)).

Opinions on the ultimate issue of disability, however, are not considered medical opinions, and do not receive the same level of deference according to the SSA regulations. 20 C.F.R. § 404.1527(d). That issue is reserved for the ALJ. *Id.* Although the ALJ is not "bound" by a controverted opinion of the treating physician on disability, he can reject that opinion only by citing "specific and legitimate reasons supported by substantial evidence in the record." *Reddick v. Chater*, 157 F.3d 715, 725 (9th Cir. 1998); *Lester*, 81 F.3d at 830. In reality, then, the "reasons for rejecting a treating doctor's credible opinion on disability are comparable to those required for rejecting a treating doctor's medical opinion." *Reddick*, 157 F.3d at 725.

### 1. Dr. Krolik

The ALJ addressed an opinion offered by Nelson's treating psychiatrist, Dr. Mary Krolik. (R. at 27.) Dr. Krolik filed a letter in which she diagnosed Nelson as seriously mentally ill and claimed Nelson "is not able to work at this time for at least a year due to her symptoms and the clinical team recommends more intensive case management and clinical treatment and medication management." (*Id.* at 321.) The ALJ gave two reasons for giving "little weight" to the statement: (1) "[t]he assertion that the claimant is unable to work is a finding reserved to the Commissioner"; and (2) "these statements are not consistent with the mild to moderate assessments contained within the treatment record."[5]

---

[5] Nelson claims that the ALJ did not cite specific contradictory evidence in the paragraph devoted to analyzing Dr. Krolik's opinion. (R. at 27.) While this is true, the

- 10 -

(*Id.* at 27.) While the ALJ is correct that the law and regulations vest the ultimate disability determination in him, that principle cannot serve as an independent reason to reject the opinion of a treating physician because the ALJ is required to weigh that opinion on disability. *See Reddick*, 157 F.3d at 725.

Nevertheless, contradiction with other medical evidence can be a specific and legitimate reason for rejection. *See, e.g.*, *Bayliss v. Barnhart*, 427 F.3d 1211, 1216 (9th Cir. 2005) ("[W]hen evaluating conflicting medical opinions, an ALJ need not accept the opinion of a doctor if that opinion is brief, conclusory, and inadequately supported by clinical findings."); *Morgan v. Comm'r of Social Sec. Admin.*, 169 F.3d 595, 602 (9th Cir. 1999). The ALJ relies chiefly on Nelson's Global Assessment of Functioning ("GAF") scores as contradictory evidence. GAF scores serve as "a rough estimate of an individual's psychological, social, and occupational functioning used to reflect the individual's need for treatment." *Vargas v. Lambert*, 159 F.3d 1161, 1164 n.2 (9th Cir. 1998). A GAF score of 51–60 indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning, while a score of 61–70 reflects mild symptoms or some difficulty in social, occupational, or school functioning, but generally functioning pretty well. *See* Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 34 (4th ed. 2000). During the relevant period of alleged disability, Nelson's scores ranged from 55 to 65. (R. at 337, 523, 542, 545, 550, 552, 555, 557, 560, 566, 571, 574, 582, 588.) Those scores reflect moderate to mild symptoms.

The Ninth Circuit has countenanced an ALJ's reliance on GAF scores as evidence that contradicts a physician's opinion of severe limitation. *See Melton v. Comm'r of Soc. Sec. Admin.*, 442 F. App'x 339, 341 (9th Cir. 2011). And Nelson's GAF scores could reasonably be perceived as inconsistent with Dr. Krolik's brief opinion that Nelson was unable to perform any work. Those scores show moderate to mild symptoms, but nothing that would be disabling.

---

ALJ appears to reference his earlier discussion of the GAF scores and opinions of Drs. Tyutyulkova and Fair. (*Id.* (referring to the "mild to moderate assessments contained in the treatment record").

Furthermore, the ALJ contrasted Dr. Krolik's opinion on the limiting effects of Nelson's symptoms with those of Drs. Tyutyulkova and Fair. (R. at 26–27.) While "[t]he opinion of a nonexamining physician cannot by itself constitute substantial evidence that justifies the rejection of the opinion of either an examining physician or a treating physician," it can play a role in determining whether the treating physician's opinion is supported by the complete medical record. *Lester*, 81 F.3d at 831–32. As discussed above, the opinions of Drs. Tyutyulkova and Fair contradict Dr. Krolik's claim that Nelson was unable to work. When combined with the moderate to mild symptoms that appear through Nelson's GAF scores, there is substantial evidence to support the ALJ's conclusion that Dr. Krolik's opinion is out of line with the record evidence.

### 2. Nurse Practitioner White

The ALJ also addressed an opinion offered by Nelson's Nurse Practitioner, Pat White. (R. at 27.) White offered an opinion that mirrored Dr. Krolik, (*id.* at 20), and the ALJ rejected White's opinion for identical reasons. Because those reasons were sufficient to reject the opinion of a treating physician, they are sufficient to reject the opinion of a nurse practitioner. *See, e.g.*, SSR 06-03p (classifying nurse practitioners as non-acceptable medical sources); *Molina*, 674 F.3d at 1111 (recognizing that the reasons for discounting an opinion from a non-acceptable medical source need only be "germane" to the source).

Thus there was no error in how the ALJ handled the opinions of Dr. Krolik and Nurse Practitioner White.

### C. Nelson's Testimony

Nelson claims the ALJ improperly discounted her testimony regarding the severity and impact of her symptoms. The legal standard governing claimant credibility is a matter of dispute between the parties. The Commissioner relies on *Bunnell v. Sullivan*, 947 F.2d 341 (9th Cir. 1991) (en banc), where the Ninth Circuit set out to "determine the appropriate standard for evaluating subjective complaints of pain in Social Security disability cases." *Id.* at 342. *Bunnell* stated that once there has been objective medical

1    evidence of an underlying impairment, the ALJ must make specific findings, supported
2    by the record, for why he rejected the claimant's testimony on the severity of the pain. *Id.*
3    at 345–46. This is to ensure that the ALJ "did not 'arbitrarily discredit a claimant's
4    testimony regarding pain.'" *Id.* (quoting *Elam v. R.R. Retirement Bd.*, 921 F.2d 1210,
5    1215 (9th Cir. 1991)). Thus the Commissioner asserts that the standard governing
6    claimant credibility is a specific finding standard, which it claims is more in line with the
7    overall "substantial evidence" standard that governs these cases.

8          Subsequent panels of the Ninth Circuit, however, have universally held that if
9    there is objective medical evidence of an underlying impairment, "and there is no
10   evidence of malingering, then the ALJ must give 'specific, clear and convincing reasons'
11   in order to reject the claimant's testimony about the severity of the symptoms." *Molina*,
12   674 F.3d at 1112 (quoting *Vasquez v. Astrue*, 572 F.3d 586, 591 (9th Cir. 2009)); *see
13   also, e.g.*, *Lingenfelter v. Astrue*, 504 F.3d 1028, 1036 (9th Cir. 2007). The Commissioner
14   claims that these cases have overruled the standard articulated in *Bunnell* in violation of
15   the Ninth Circuit rule that only en banc panels can overrule existing precedent. *See
16   United States v. Camper*, 66 F.3d 229, 232 (9th Cir. 1995). That is not the case. *Bunnell*
17   articulated a general standard for dealing with claimant testimony. The many subsequent
18   cases have addressed a subset of cases where there is also no evidence of claimant
19   malingering. They have articulated a "clear and convincing" standard for those situations.
20   This Court does not judge the propriety of that standard, which is clearly the standard that
21   governs claimant credibility in this circuit. Accordingly, the ALJ's reasons for finding
22   Nelson's testimony incredible must be "clear and convincing."

23         The ALJ did not find Nelson's testimony regarding the extent and severity of her
24   symptoms credible for several reasons. First, the ALJ noted that Nelson and her friend
25   "[d]escribed daily activities that are not limited to the extent one would expect, given the
26   complaints of disabling symptoms and limitations." (R. at 25.) The record reflects that
27   Nelson frequently cooks, shops, does chores around the house, socializes, takes her dog
28   on walks, swims, attends yard sales, uses public transportation, goes to the gym, and gets

along well with family, friends and neighbors. (*Id.* at 175–83.) While there are indications that she sometimes experiences difficulty with these activities, the record largely reflects that Nelson lives an active life. Of course disability claimants do not need to lock themselves indoors and remain sedentary to ensure receipt of disability benefits. *Reddick*, 157 F.3d at 722; *Satterwaite v. Astrue*, 781 F. Supp. 3d 898, 911 (D. Ariz. 2011). Yet an ALJ can rely on a claimant's participation in such activities when their description contradicts claims of a totally debilitating impairment. *Molina*, 674 F.3d at 1112–13 (citing cases); *Berry v. Astrue*, 622 F.3d 1228, 1235 (9th Cir. 2010) (finding that "the inconsistencies in Berry's reported symptoms and activities adequately support the ALJ's adverse credibility finding and justify his decision to discount some of Berry's subjective complaints"); *Batson*, 359 F.3d at 1196 (upholding ALJ's rejection of claimant's assertion that he could not return to work when he "tends to animals, walks outdoors, goes out for coffee, and visits with neighbors"). The ALJ properly did so here. Nelson's fairly active lifestyle could be seen as inconsistent with her claims of disability.

Nelson disputes that her activities are inconsistent with disability. "Although the evidence of [Nelson's] daily activities may also admit of an interpretation more favorable to [Nelson], the ALJ's interpretation was rational, and '[the Court] must uphold the ALJ's decision where the evidence is susceptible to more than one rational interpretation.'" *Burch v. Barnhart*, 400 F.3d 676, 680–81 (9th Cir. 2005) (quoting *Magallanes v. Bowen*, 881 F.2d 747, 750 (9th Cir. 1989)); *see also Rollins v. Massanari*, 261 F.3d 853, 857 (9th Cir. 2001) ("It is true that Rollins' testimony was somewhat equivocal about how regularly she was able to keep up with all of these activities, and the ALJ's interpretation of her testimony may not be the only reasonable one. But it is still a reasonable interpretation and is supported by substantial evidence; thus, it is not our role to second-guess it."). This Court is not the designated forum to examine and reweigh possible interpretations of the evidence. The ALJ reasonably construed the evidence of Nelson's daily activities to contradict her claims of a disabling illness. This was a clear and convincing ground supported by substantial evidence for rejecting Nelson's symptom

testimony.

The second reason the ALJ did not credit Nelson's claims of severe symptoms is related to the first: Nelson attends school regularly. (R. at 26.) She was a full-time student in 2008 and 2009 and had decent grades, although there was some evidence that she was failing a class. (*Id.* at 328, 336, 572, 579–80.) A reasonable person could perceive regular, full-time school attendance as inconsistent with a claim of total disability. While Nelson expressed feelings of struggle during school, the ALJ never claimed Nelson was symptom-free during that time—merely that Nelson could perform regular school activities despite her symptoms. On that evidence, the ALJ could properly conclude that regular, full-time school participation contradicts a claim of disabling impairment.

The ALJ's third reason is that Nelson collected unemployment benefits for two years after she lost her last job in 2008. (*Id.* at 26.) ALJ reliance on the receipt of unemployment is not impermissible. *See Copeland v. Bowen*, 861 F.2d 536, 542 (9th Cir. 1988) (upholding ALJ's rejection of claimant testimony on this basis). Nelson cites an SSA policy letter that instructs ALJs on how they should consider receipt of unemployment benefits. The letter states that "[r]eceipt of unemployment benefits does not preclude the receipt of Social Security benefits. . . . However, application for unemployment benefits is evidence that the ALJ must consider together with all of the medical and other evidence. Often, the underlying circumstances will be of greater relevance than the mere application for and receipt of benefits." (Doc. 13-1, Ex. B.) The ALJ did not violate this policy by relying, in part, on Nelson's receipt of unemployment benefits as evidence that her symptoms did not preclude her from work. Whether simply receiving unemployment benefits is a clear and convincing reason for rejecting a claimant's testimony is a question left for another day—the ALJ has promulgated other clear and convincing reasons for finding Nelson's symptom testimony incredible.

Finally, the ALJ cited the contradictions between Nelson's testimony and the record evidence, including her GAF scores and the effectiveness of her medication. (R. at 26.) Nelson has not contested the ALJ's reliance on these factors, which also serve as

clear and convincing reasons for discounting Nelson's symptom testimony. The ALJ therefore did not err in his handling of Nelson's testimony.

### D. Third Party Report

Nelson claims that the ALJ erred by failing to consider the Third Party Report submitted by her friend, Penny Alvarez. While the ALJ did not expressly consider Alvarez's report, he cited the Third Party Report when he reviewed Nelson's activities of daily living. (*Id*. at 25.) He accepted and relied upon Alvarez's descriptions of Nelson's daily activities. (*Id.*) The ALJ was not required to cite Alvarez by name, and his decision reflects consideration of the Report. No error occurred.

## CONCLUSION

There was no material error in the ALJ's decision.

**IT IS THEREFORE ORDERED** that the ALJ's decision is **AFFIRMED**. The Clerk of Court is directed to enter judgment in this matter.

Dated this 6th day of August, 2013.

/G. Murray Snow
United States District Judge